**Mable CALEB, Jackie Anderson, Patrick Cockerham, Diann Banks, and Herbert Lenton, Appellants**

v.

**Richard A. CARRANZA, Superintendent of the Houston Independent School District, Appellee**

NO. 01-15-00285-CV

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued March 30, 2017

Laurence Watts, WATTS & COMPANY LAWYERS, LTD., P.O. Box 2214, Missouri City, TX 77459, for Appellant.

Arturo G. Michel, John M. Hopkins, THOMPSON & HORTON LLP, 3200 Southwest Freeway, Suite 2000, Houston, TX 77027, Holly G. McIntush, 400 West 15th Street, Suite 1430, Austin, TX 78704, for Appellee.

Panel consists of Justices Bland, Massengale, and Lloyd.

## OPINION

Michael Massengale, Justice

This is an appeal from the dismissal of a lawsuit against the former superintendent of the Houston Independent School District. The appellants, who are former employees of the school district, sought injunctive and declaratory relief stemming from an investigation that culminated in a recommendation to terminate their employment.

The pleadings do not allege a facially valid challenge to any constitutional right, and they are barred by governmental immunity. As such, the trial court properly granted the plea to the jurisdiction. We affirm.

### Background

We take the appellants' pleadings as true for purposes of this appeal. The dispute arises from an investigation by the Houston Independent School District into allegations of employee misconduct.[1] Mable Caleb was the principal of Key Middle School when, in the summer of 2009, she was appointed principal of Kashmere High School. Caleb was asked to remain as transitional principal at Key until a permanent replacement could be found. After a replacement principal was appointed at Key, Terry Grier became the superintendent of HISD. Grier replaced the newly appointed Key principal with another person, resulting in an outcry and demonstrations from the community.

On October 31, 2009, after being relieved of all responsibilities relating to Key, Caleb moved all of her personal belongings and some school property from Key to Kashmere. She was assisted by appellant

---

1. For a more detailed discussion of the factual background, see *Caleb v. Grier*, No. H-12-0675, 2015 WL 1954678 (S.D. Tex. Apr. 29, 2015), and *Caleb v. Grier*, No. H-12-0675, 2013 WL 2902785 (S.D. Tex. Jun. 13, 2013), *aff'd*, 598 Fed.Appx. 227, 237 (5th Cir. 2015) (per curiam), *cert. denied*, —— U.S. ——, 135 S.Ct. 2813, 192 L.Ed.2d 849 (2015).

Herbert Lenton, Key's operations manager, in accordance with HISD procedures. In late November 2009, Grier hired a law firm to investigate the transfer of property, which by then had attracted some media attention. The investigation focused on the transfer of property from Key to Kashmere and on allegations that teachers at Key provided students with actual test problems to practice for standardized tests in order to increase their scores.

The attorney-investigators questioned Caleb and Lenton, as well as others connected to Caleb, including appellants Jackie Anderson, Patrick Cockerham, and Diann Banks. Anderson was a union representative and friend of Caleb who served as the Special Education Department Chair at Key from 2008 to 2009. Cockerham had been an aide to Anderson at Key, and he transferred to Kashmere with Caleb. Banks had been a math teacher at Key from August 2005 through June 2010.

Upon completion of the investigation, the law firm reported its findings to HISD. Grier shared the findings with the media, the public, and the Texas Education Agency. Based on the report, Grier terminated Caleb in April 2010, and he proposed termination of Cockerham and nonrenewal of the one-year contracts of Anderson and Banks. Upon instruction from Grier, Lenton's supervisor recommended that he be terminated. Administrative hearings cleared Anderson and Cockerham, and the hearing officers recommended that they not be dismissed from employment. Lenton also sought an administrative hearing, but the appellate record does not indicate the results of that hearing. Although Banks was cleared of allegations that she participated in the standardized testing scandal, she resigned due to an unpleasant work environment.

Caleb, Anderson, Cockerham, Banks, and Lenton filed suit against numerous defendants, including Grier in his official capacity. Among the defendants, this appeal pertains only to Grier. The live pleading at the time the claims against Grier were dismissed was the fifth amended petition. That petition alleged that Grier violated various provisions of the Texas Constitution when he "terminated" the appellants "based on a report he commissioned" without giving them "the opportunity to refute the claims contained within before making them public."

The appellants sought a declaration that their constitutional rights were violated by Grier. They requested an injunction preventing Grier from violating their constitutional rights and requiring him to reinstate them "to positions of employment occupied or reasonably comparable to those respectively occupied before November 12, 2009, with all attendant benefits" and to expunge the report from their personnel records. The appellants also sought recovery of attorney's fees and costs.

Grier filed a plea to the jurisdiction. He did not challenge any jurisdictional facts. Instead, he argued that he was immune from the claims. The trial court granted the plea and dismissed the claims against Grier with prejudice. That order was appealed.

While the appeal was pending in this court, Caleb settled her claims against Grier, and she filed an agreed motion to dismiss her appeal, which we now grant. *See* Tex. R. App. P. 42.1(a)(1). The granting of this motion leaves Anderson, Cockerham, Banks, and Lenton as the remaining appellants. While this appeal has been pending, Grier was replaced by Richard A. Carranza as HISD superintendent, who has been substituted as the appellee. Tex. R. App. P. 7.2(a).

### Analysis

In a single issue, the appellants argue that Grier was not immune from suit be-

cause he violated the state constitution, acting outside his legal authority and his lawful discretion as superintendent of HISD. We review de novo the trial court's ruling on a plea to the jurisdiction. *See, e.g., Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015).

▮ "Sovereign immunity requires the state's consent before it can be sued." *Hall v. McRaven*, 508 S.W.3d 232, 232 (Tex. 2017). "Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State, including counties, cities, and school districts." *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). "[I]n certain narrow instances, a suit against a state official can proceed even in the absence of a waiver of immunity if the official's actions are *ultra vires*." *Hall*, 508 S.W.3d at 232. "An *ultra vires* action requires a plaintiff to 'allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Id.* (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). "The basic justification for this *ultra vires* exception to sovereign immunity is that *ultra vires* acts—or those acts without authority—should not be considered acts of the state at all." *Id.*

▮ "[A] government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hous. Belt & Terminal Ry. Co. v. City of Hous.*, 487 S.W.3d 154, 158 (Tex. 2016). Governmental immunity thus does not bar "suits complaining of *either* an officer's failure to perform a ministerial act *or* an officer's

exercise of judgment or *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act." *Id.* at 163.

In this case, the appellants alleged that the "termination of their employment" and the commissioning and publication of the investigation report violated their rights under the Texas Constitution. An allegation that a government officer violated the Texas Constitution is an allegation that the officer acted *ultra vires*, that is, in conflict with the law constraining his discretion. *See id.* Nevertheless, when a plaintiff sues to vindicate a constitutional right, "immunity from suit is not waived if the constitutional claims are facially invalid." *Klumb*, 458 S.W.3d at 13 (citing *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011)).

The appellants alleged that "the sole reason for the termination of their employment" was their unwillingness to comply with a request by Grier and his investigators to falsely implicate Caleb on various allegations and to implicate another person for cheating on standardized tests. The appellants also complained that their termination was based on a report commissioned by Grier, which he published before giving them an opportunity to refute its contents. The appellants contend that these acts violated the Texas Bill of Rights, Sections 3 (equal rights), 8 (freedom of speech), and 19 (due course of law).[2]

## I. Equal protection

▮ The Texas Constitution provides that all people "have equal rights, and no

---

**2.** In addition to sections 3, 8, and 19, in their Fifth Amended Petition the appellants alleged violations of section 1 (freedom and sovereignty of state). In their appellate brief, they suggest an additional violation of section 12

(habeas corpus). We confine our analysis to sections 3, 8, and 19, as these are the only allegations analyzed in the appellants' brief. *See* Tex. R. App. P. 38.1(i).

man, or set of men, is entitled to exclusive separate public emoluments, or privileges." TEX. CONST. art. 1, § 3. The appellants contend that Lenton was subjected to "disparate treatment" as compared to other employees who participated in moving property from Key to Kashmere.[3] The appellants' brief contains no argument to support an equal-protection claim by Anderson, Cockerham, or Banks.

■ To establish a viable equal-protection claim under the Texas Constitution, Lenton would have to prove he was "treated differently from others similarly situated." *Klumb*, 458 S.W.3d at 13. However, there is a fundamental inconsistency between that legal standard and a single public employee's allegation that he has been wrongly terminated from employment. *Cf. Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 605, 128 S.Ct. 2146, 2155, 170 L.Ed.2d 975 (2008) (applying federal Equal Protection Clause); *see also Klumb*, 458 S.W.3d at 13 n.8 (acknowledging that federal equal-protection authorities may be persuasive authority in the context of state equal-protection claims). "[E]mployment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Engquist*, 553 U.S. at 604, 128 S.Ct. at 2154. Moreover, "recognition of a class-of-one theory of equal protection in the public employment context—that is, a claim that the State treated an employee differently from others for a bad reason, or for no reason at all—is simply contrary to the concept of at-will employment." *Id.* at 606, 128 S.Ct. at 2156. We therefore conclude the appellants' petition failed to plead a facially valid equal-protection claim by alleging that Lenton, alone, suffered an adverse employment consequence as compared to other employees.

## II. Free speech

■ The Texas Constitution provides: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." TEX. CONST. art. I, § 8. The appellants' argument regarding free-speech violations is primarily focused on public statements by Caleb, who has dismissed her appeal. The only free-speech argument relating to the remaining appellants is that they had a constitutionally protected right to refuse to "testify falsely" against other employees.

■ Other than quoting Section 8 of the Texas Bill of Rights, the appellants offer no legal argument or authority for their contention that they alleged a facially valid free-speech claim. In particular, the appellants offer no arguments based on the text, history, or purpose of Section 8 that it provides them any greater protection in this context than that provided by the First Amendment. As such, we may rely upon persuasive authorities applying free-speech protections under both the federal and Texas constitutions. *See, e.g., Tex. Dept. of Transp. v. Barber*, 111 S.W.3d 86, 106 (Tex. 2003); *Davenport v. Garcia*, 834 S.W.2d 4, 40 (Tex. 1992) (Hecht, J., concurring) ("When state and federal provisions overlap or correspond, state law, as well as federal law and the

---

3. The appellants' brief also suggests that Lenton was treated differently than two teachers who "suppressed information" about cheating on standardized tests yet were "rewarded with continued employment." These factual allegations were not a basis for the cause of action against Grier pleaded in the trial court, and thus we need not address those allegations, which were not before the trial court and are being made for the first time on appeal.

law of other states, may be helpful in analyzing their proper application.").

 A governmental employee's speech may be entitled to constitutional protections. *See, e.g., Turner v. Perry*, 278 S.W.3d 806, 816 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *Price v. Tex. Alcoholic Beverage Com'n*, No. 01-12-01164-CV, 2014 WL 3408696, at *6 (Tex. App.—Houston [1st Dist.] July 10, 2014, pet. denied) (mem. op.). To prevail on a constitutional free-speech retaliation claim, the appellants would be required to establish that: (1) they suffered an adverse employment decision; (2) their "speech" involved a matter of public concern;[4] (3) their interest in commenting on matters of public concern outweighed their employer's interest in promoting efficiency; and (4) their speech motivated the adverse employment decision. *See Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001). As public employees, the appellants also would be required to establish that they spoke as citizens, rather than as employees pursuant to their official duties. While "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 1957, 164 L.Ed.2d 689 (2006), not all speech by public employees is constitutionally protected. When "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. at 1960. However, "the mere fact that a citizen's speech concerns information acquired by virtue of

his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, —— U.S. ——, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014). Accordingly, the critical question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

The appellants' claim for retaliation against their exercise of free-speech rights is facially invalid, because their pleadings establish that the "speech" at issue was made pursuant to their official duties. In their petition, they suggested that they exercised free speech when they refused to "falsely implicate Caleb on various allegations" or to implicate another employee for cheating on standardized tests. But they also alleged that they were ordered by HISD officials to take part in those interviews. Furthermore, the appellants alleged facts that show that these meetings were directly related to their employment. The interviews concerned allegations of cheating on standardized tests and misappropriation of school property. Accordingly, it is undisputed that the speech (or refusal to speak) at issue was made within the chain of command and that it was related to the appellants' jobs, which are both factors that previously have been considered in determining that speech was made as an employee and not as a citizen. *See, e.g., Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008). Moreover, assisting in an employer's investigation into workplace theft is ordinarily within the scope of an employee's job duties, and a teacher's duties include ensuring compliance with standardized testing procedures. That the appellants were required to

---

4. At least for purposes of the First Amendment, the fact that the appellants in this case have alleged retaliation based on their refusal to speak does not affect the analysis. *See Riley* *v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796–97, 108 S.Ct. 2667, 2677–78, 101 L.Ed.2d 669 (1988).

speak in the course of their assistance in the investigation did not "mean [their] supervisors were prohibited from evaluating [their] performance." *Garcetti*, 547 U.S. at 422, 126 S.Ct. at 1954. As such, the speech that the appellants alleged as the basis for their employer's retaliation was made pursuant to their official duties. It is therefore outside the ambit of free-speech protection, and they have failed to allege a facially valid constitutional claim. *Accord Caleb v. Grier*, 598 Fed.Appx. 227, 236–37 (5th Cir. 2015), *cert. denied*, —— U.S. ——, 135 S.Ct. 2813, 192 L.Ed.2d 849 (2015).

### III. Due course of law

■ The Texas Constitution provides: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of law of the land." TEX. CONST. art. I, § 19. The appellants have offered no argument that Section 19 has an application to their claims that is substantively different than the due-process protections of the Fourteenth Amendment. As such, our analysis is informed by authorities applying the Fourteenth Amendment. *See, e.g.*, *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995).

■ "A public employer may unconstitutionally deprive its employee of a liberty interest if it discharges him under stigmatizing circumstances without giving the employee an opportunity to clear his name." *Arrington v. County of Dall.*, 970 F.2d 1441, 1447 (5th Cir. 1992); *see Brantley v. Texas Youth Com'n*, 365 S.W.3d 89, 106 (Tex. App.—Austin 2011, no pet.). "To assert a claim for the deprivation of this constitutional right to a name-clearing hearing, a plaintiff must allege that he was a public employee, that he was discharged, that stigmatizing charges were made against him in connection with his dis-

charge, that the charges were false, that the charges were made public, that he requested a name-clearing hearing, and that the hearing was denied." *Arrington*, 970 F.2d at 1447; *see Brantley*, 365 S.W.3d at 106. The "public charges must be so stigmatizing that they create a 'badge of infamy' that destroys plaintiffs' ability to obtain other employment." *Arrington*, 970 F.2d at 1447 (quoting *Evans v. City of Dall.*, 861 F.2d 846, 851 (5th Cir. 1988)); *Brantley*, 365 S.W.3d at 106.

The appellants' petition affirmatively negated an element of their due-course-of-law claim. The appellants all alleged that they requested and received a name-clearing hearing. Cockerham, Anderson, and Banks alleged that they were successful at their hearings and that the hearing officers found that the allegations against them were meritless and recommended that they be retained. Lenton did not allege an outcome of his hearing. In addition, Banks alleged that she was hired by another school district after her resignation, demonstrating that any charges leveled against her were not so stigmatizing as to prevent her from obtaining employment elsewhere. Accordingly, each appellant failed to allege a facially valid due-course-of-law claim.

### Conclusion

There is no facially valid constitutional claim among the appellants' allegations. Accordingly, there is no actionable allegation that Grier's challenged actions were *ultra vires* so as to remove the shield of governmental immunity. We affirm the judgment of the trial court.